United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 28, 2003**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 25, 2003
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-60322
Cons w/ 03-60248
_____

HARRIET GOLDSTEIN; ET AL

Plaintiffs

MICHAEL SABBIA; WAYNE COUNTY EMPLOYEES RETIREMENT
SYSTEM; DAVID KLEIN; SIMMS FAMILY

Plaintiffs - Appellants

v.

MCI WORLDCOM; BERNARD J EBBERS; SCOTT SULLIVAN

Defendants - Appellees

_____

Appeals from the United States District Court
for the Southern District of Mississippi
_____

Before KING, Chief Judge, and REAVLEY and STEWART, Circuit
Judges.

KING, Chief Judge:

Shareholders of WorldCom Corporation (now known as MCI
WorldCom) appeal from the dismissal with prejudice of their
consolidated amended complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6) and the Private Securities Litigation Reform

1

Act, 15 U.S.C. §§ 78u-4, and from the district court's denial of their Federal Rule of Civil Procedure 60(b) motion for relief from judgment. We agree with the district court that the plaintiffs' complaint against the defendants Bernard J. Ebbers and Scott D. Sullivan does not adequately plead scienter in conformity with the Reform Act, Rule 9(b) of the Federal Rules of Civil Procedure and controlling case law interpreting each, and we affirm the district court's judgment insofar as it dismissed the complaint against Ebbers and Sullivan. We also affirm the denial of the plaintiffs' Rule 60(b) motion for relief from the judgment in favor of Ebbers and Sullivan.

## I.

### INTRODUCTION OF THE SINGLE CLAIM ON APPEAL

Now a global telecommunications company with operations in sixty-five countries, MCI WorldCom ("WorldCom") began as a small Mississippi company, Long Distance Discount Services, Inc., formed in 1983 and licensed from 1983 to 1985 to provide long distance services only to Mississippi businesses and residents. Beginning in 1984, under the direction of its chief executive officer, defendant Bernard J. Ebbers, this local long distance company acquired other telecommunications companies at a phenomenal pace, making over sixty acquisitions in just fifteen years. In line with a strategy of growth by acquisition, in September 1998, WorldCom purchased MCI Communications Corporation in what was then the

largest corporate merger ever, valued at approximately $40 billion. With this acquisition, WorldCom became the second largest telecommunications company in the world, behind only AT&T. Relevant for the purposes of this controversy, in October 1999, WorldCom announced its plan to enter into a stock-for-stock merger with Sprint, then the third largest telecommunications company in the United States, in a deal valued at $129 billion; however, on July 13, 2000, WorldCom announced that federal regulators had rejected the planned merger.

Further adverse developments ensued, and by late April 2002, the independent members of the board of directors had called for Ebbers' resignation. Additionally, on June 25, 2002, WorldCom publicly disclosed that it had discovered substantial accounting irregularities that would require it to restate financial statements for 2001 and the first quarter of 2002. On this same date, WorldCom's board of directors also terminated its former chief financial officer and then executive vice president, defendant Scott D. Sullivan. Approximately four weeks later, on July 21, 2002, WorldCom filed for Chapter 11 bankruptcy protection.

This suit involves the alleged conduct of WorldCom, Ebbers and Sullivan during only a small (and somewhat early) period (the "class period") in WorldCom's demise – February 10 to November 1, 2000 – when the plaintiffs purchased WorldCom stock. Further, on appeal, we are called upon to address only one claim of fraud – that Ebbers and Sullivan knowingly or with severe recklessness

3

failed to direct the write-off of millions of dollars worth of uncollectible accounts, resulting in material misrepresentations and omissions in WorldCom's financial statements and communications with shareholders and the investing public in violation of the Securities Exchange Act of 1934 (the "1934 Act"), all in order to inflate WorldCom's stock price artificially for the pending Sprint merger.  Bearing this limited scope in mind, we briefly set forth the procedural background to this case.

## II.

## PROCEDURAL BACKGROUND

On October 26, 2000, WorldCom issued a press release reporting, for the first time, that due to bankruptcies by seventeen of its wholesale customers, WorldCom had decided to write off $685 million pre-tax ($405 million after-tax) in receivables – a write-off that plaintiffs allege was stalled fraudulently to inflate WorldCom's financials.  The announcement resulted in a drop in the stock price from $25.25 (on trading volumes of approximately 40 million) to $21.75 (on trading volumes of nearly 67 million).

Following this announcement, on November 7, 2000, several lawsuits were filed in Mississippi, New York and Washington D.C. These actions were consolidated with this case (in Mississippi) on March 27, 2001.  Lead plaintiffs were thereafter selected, notice to potential class claimants was provided, and on June 1, 2001, the lead plaintiffs filed the consolidated amended complaint (the

4

"complaint") on behalf of all persons who purchased or otherwise acquired the securities of WorldCom during the class period, i.e., between February 10 and November 1, 2000.[1]

The 110-page, 285-paragraph complaint makes numerous allegations of corporate malfeasance on the part of WorldCom, Ebbers and Sullivan, together with violations of Section 10(b) of the 1934 Act, Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and Section 20(a) of the 1934 Act.

Relevant for the purposes of this appeal are the allegations that WorldCom's uncollectible receivables "skyrocketed" during the class period, in part, because the defendants allowed over $500 million of "worthless" accounts receivable to remain on the books, and, consequently, to be inaccurately reflected in WorldCom's financials and public statements.  This alleged modus operandi of failing to write off clearly uncollectible accounts receivable during the class period resulted from the defendants' desire to avoid attracting negative attention while federal regulators considered the Sprint merger and to ensure that the stock-for-stock deal was completed on the most favorable terms possible to WorldCom.

On August 8, 2001, the defendants filed a motion to dismiss the plaintiffs' complaint.  In their motion, the defendants argued

---

[1]    The class has not yet been certified.

that the plaintiffs' "puzzle pleading" was insufficient to satisfy the "rigorous" pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4 and 78u-5 (2000), as interpreted by this court. Although the plaintiffs defended their complaint as compliant with applicable pleading standards, they reflexively sought leave of the court to amend their complaint to cure pleading deficiencies.

On March 29, 2002, the district court granted the defendants' motion and dismissed the plaintiffs' complaint with prejudice. On this same date, it entered final judgment in favor of the defendants. On April 5, 2002, the plaintiffs timely filed an appeal of the judgment to this court; however, while the appeal was pending, WorldCom, but not Ebbers and Sullivan, voluntarily filed for Chapter 11 bankruptcy protection. After receipt of a "suggestion of bankruptcy," this court determined that the bankruptcy stay of proceedings (11 U.S.C. § 362) extended only to WorldCom and not to Ebbers and Sullivan. Goldstein v. MCI WorldCom, No. 02-60322, at *4 (5th Cir. October 28, 2002).

In consideration of the bankruptcy filing and the events leading up to the bankruptcy filing, on August 23, 2002, the plaintiffs filed, in the district court, a motion for relief from judgment based on certain "newly discovered" evidence. On March 5, 2003, the district court denied the plaintiffs' Rule 60(b) motion. The plaintiffs thereafter timely appealed this denial. We granted the plaintiffs' motion to expedite this appeal and consolidated the

6

two WorldCom appeals pending before us.

It bears emphasizing that because of the stay applicable to proceedings against WorldCom, these appeals proceed only as to claims against Ebbers and Sullivan.

## III.

## ANALYSIS OF THE PLAINTIFFS' CLAIM

The only claim against Ebbers and Sullivan the plaintiffs seek to salvage on appeal is that claim related to misrepresentations and omissions in WorldCom's financial statements and other statements to the public resulting from Ebbers' and Sullivan's alleged severe recklessness in failing to write off over $500 million of uncollectible accounts receivable. As to this claim, the district court ruled that the plaintiffs had not pleaded facts giving rise to a "strong inference of scienter" on the part of Ebbers and Sullivan.

We review the district court's dismissal de novo, Abrams v. Baker Hughes, Inc., 292 F.3d 424, 430 (5th Cir. 2002), accepting the facts alleged in the plaintiffs' complaint as true and construing their allegations in the light most favorable to them. Id. However, we will not "strain to find inferences favorable to the plaintiff[s]." Westfall v. Miller, 77 F.3d 868, 870 (5th Cir. 1996).

Before delving into the specific allegations of scienter pleaded in the complaint here, we set forth the pleading standards

7

required to withstand a motion for dismissal of a securities action governed by the PSLRA.

**A.  Section 10(b), Rule 10b-5 and Pleading Requirements under the PSLRA**

In their complaint, the plaintiffs allege violations of section 10(b) of the 1934 Act and SEC Rule 10b-5 (promulgated by the SEC under section 10(b) of the 1934 Act).[2]  It is well-settled

---

[2]  Section 10(b) provides in relevant part:

It shall be unlawful for any person, directly or indirectly . . .

(b) To use or employ, in connection with the purchase or sale of any security . . .  any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (2000).  Rule 10b-5 provides in relevant part:

It shall be unlawful for any person, directly or indirectly . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2001).  The plaintiffs also sought relief under section 20(a) of the 1934 Act.  This section provides in relevant part:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person.

that, "[i]n order to state a claim under section 10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" Nathenson v. Zonagen, Inc., 267 F.3d 400, 406-07 (5th Cir. 2001) (quoting Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994)).

In 1995, Congress amended the 1934 Act through the passage of the PSLRA. As we have stated, the PSLRA imposes procedural pleading requirements on plaintiffs pursuing private securities fraud actions. In relevant part, the PSLRA, 15 U.S.C. § 78u-4(b)(1), provides that:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

---

15 U.S.C. § 78t(a). However, the plaintiffs did not specifically appeal the dismissal of this count. We thus do not address it here.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure, which we have interpreted to apply to securities fraud claims, Williams v. WMX Techs., Inc., 112 F.3d 175, 177 (5th Cir. 1997), states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b).

In ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336 (5th Cir. 2002), we coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants:

> To summarize, a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):
>
> (1)  specify the [sic] each statement alleged to have been misleading, i.e., contended to be fraudulent;
> (2)  identify the speaker;
> (3)  state when and where the statement was made;
> (4)  plead with particularity the contents of the false representations;
> (5)  plead with particularity what the person making the misrepresentation obtained thereby; and
> (6)  explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.
>
> This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA.

Id. at 350.

## B.   Pleading Scienter under the PSLRA

Here, the central issue is whether the plaintiffs have pleaded the scienter element of their claims with requisite specificity.

10

"Scienter" is "a mental state embracing intent to deceive, manipulate, or defraud," Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). Although scienter is not explicitly mentioned in the text of Rule 10b-5 or section 10(b), it has been interpreted to be an essential element of these claims. Id. In Nathenson, we stated that the plain language of the PSLRA makes clear that our previous rule, which required that a plaintiff plead facts that merely "support an inference of fraud," had been supplanted by the PSLRA's "strong inference" requirement. 267 F.3d at 407. We therefore held that "in order to survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b-5 claim must now plead specific facts giving rise to a 'strong inference' of scienter." Id.

We cautiously clarified, however, that "[i]t seems clear to us that the PSLRA has not generally altered the substantive scienter requirement for claims brought under section 10(b) and Rule 10b-5." Id. at 408 (emphasis added). We therefore joined those courts of appeals concluding that "severe recklessness" still constitutes scienter for purposes of claims brought under section 10(b) and Rule 10b-5, as was the law in this circuit before the PSLRA amendments. Therefore, post-PSLRA, plaintiffs can demonstrate scienter by a showing of "severe recklessness" – defined as:

> [L]imited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of

11

> misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Id. (quoting Broad v. Rockwell, 642 F.2d 929, 961 (5th Cir. 1981) (en banc)). Thus our task here is to review the complaint with a view to determining whether the allegations of fraud contained in the complaint are sufficiently connected to Ebbers and Sullivan such that a strong inference of scienter on their part is appropriate.

### (1) Circumstantial Evidence

In this review, we are aided by several basic principles. First, "there does not appear to be any question that under the PSLRA circumstantial evidence can support a strong inference of scienter." Nathenson, 267 F.3d at 410. Thus, factual settings like that confronted by the Second Circuit in Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000), do not constitute an evidentiary floor under the PSLRA. There, the plaintiff investors pleaded facts demonstrating that certain management officials of the defendant retail store, Ann Taylor, acted intentionally and deliberately to inflate the company's reported financial results artificially by knowingly sanctioning fraudulent inventory management practices. Id. at 304. Specifically, the complaint particularized, through direct evidence, the individual defendants' involvement in a "box and hold" cover-up scheme whereby out-of-date inventory that constituted as much as 34% of the total inventory was stored in

12

several warehouses during the class period deliberately to avoid markdowns. Id.

While this court has agreed that the direct evidence of intent particularized in the Novak complaint certainly meets the procedural prerequisites of the PSLRA, Abrams, 292 F.3d at 432-33, we have never required a plaintiff to present direct evidence of scienter in order to withstand dismissal of his securities claims. Allegations of circumstantial evidence justifying a strong inference of scienter will suffice. See, e.g., Nathenson, 267 F. 3d at 424-25 (holding that "the necessary strong inference of scienter" was pleaded as to the president, chief executive officer, and director defendant, in part, because of his heavy involvement in the day-to-day operations of a small company); see also Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000) (concluding that "the magnitude of the write-off renders less credible the proposition that during the [] Class Period, [the defendant] believed it likely that it could recover those royalty advances through future sales").

*(2) Motive and Opportunity*

Second, as to the status of whether allegations of motive and opportunity can create the necessary strong inference of scienter, a question which has notably divided the courts of appeals which have addressed it, we have concluded that "[a]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter," but that allegations of

13

motive and opportunity, without more, will <u>not</u> fulfill the pleading requirements of the PSLRA.  <u>Nathenson</u>, 267 F.3d at 412.

*(3)  Totality of the Circumstances*

Finally, we consider all the facts and circumstances alleged to determine whether they, in toto, raise a requisite strong inference of scienter.  <u>Abrams</u>, 292 F.3d at 430; <u>Nathenson</u>, 267 F.3d at 410.  This rule is evident from our discussion in <u>Nathenson</u>.  There, plaintiff shareholders brought a class action lawsuit against a Texas-based biopharmaceutical company, its CEO, and two outside directors alleging that these defendants made a series of misrepresentations about two of its potential products awaiting approval by the Food and Drug Administration in order to inflate the company's share price artificially.  267 F.3d at 405. The district court dismissed the plaintiffs' complaint.  <u>Id.</u> at 406.  As to the majority of the plaintiffs' claims, we agreed with the district court that dismissal was appropriate.  <u>Id.</u> at 426. However, we found error in the district court's dismissal regarding the allegation that the defendant company and the defendant CEO represented that its newly acquired patent (known as the Zorgniotti patent) covered the company's use of Vasomax, a potential drug product going through the FDA approval process, when the totality of the circumstances, as alleged, provided a strong inference that these defendants knew otherwise but wanted to inflate their company's share price.  In so doing, we stated:

[T]here are a number of special circumstances here which,

14

taken together, suffice to support a [strong inference of scienter].  To begin with, [the company] was essentially a one product company, and that product was Vasomax.  Thus . . . "the Company's future prospects [were] substantially dependent on" Vasomax . . . Further, the patent protection for Vasomax was obviously important . . . [The defendant CEO] is quoted as describing the approval of the Zorgniotti patent as a "crucial event[]." Additionally, the Company had acquired the Zorgniotti patent application in April 1994, so there was ample opportunity to become familiar with it prior to June 1996.  In this connection, we also note that the Company is not large.  As reflected by its 10K's filed April 1, 1996 and March 31, 1997, the Company had only thirty-two full time employees in January 1996 and only thirty-five in January 1997.  Finally, the Company's June 24, 1996 and November 6, 1996 press releases, which describe the Zorgniotti patent, both quote [the CEO], and an article in the issue of <u>Fortune</u> distributed in mid-February 1998, states: "[i]n a recent interview, [the CEO] concedes, 'You can say today no patent specifically covers Vasomax;' he claims the company's issued patent 'broadly covers' the drug."  Taking all the above factors together we conclude that they suffice, if perhaps barely so, to support the necessary "strong inference" of scienter on the part of [the CEO] and [the company] with respect to the statements that the Zorgniotti patent covers [the company's] use of Vasomax.

<u>Id.</u> at 425 (internal footnotes omitted).  Thus, as taught by <u>Nathenson</u> (and reaffirmed in <u>Abrams</u>), we must consider any evidence of scienter pleaded by the plaintiffs cumulatively.

**C.   The Plaintiffs' Complaint – Public Statements by Ebbers and Sullivan**

The complaint alleges that material statements and omissions were made by Ebbers and Sullivan allegedly in connection with the following financial statements and public statements: (1) WorldCom's fourth quarter 1999 and year-end results issued on

15

February 10, 2000, the press release reporting these results, and the conference call for the investing community, including analysts, held by WorldCom on this same date; (2) WorldCom's Annual Report, sent to shareholders in March 2000, the letter from Ebbers included in this report, and WorldCom's Annual Report on Form 10-K for fiscal year 1999, filed on March 30, 2000; (3) WorldCom's press release reporting financial results for the first quarter of fiscal year 2000, the quarter ended March 31, 2000, which was issued on April 27, 2000, and the conference call for the investing community, including analysts, held by WorldCom on this same date; (4) WorldCom's quarterly report on Form 10-Q, for the period ended March 31, 2000, filed on May 15, 2000; (5) WorldCom's Prospectus, alleged to have been filed on May 22, 2000; (6) WorldCom's press release announcing results for the second quarter of fiscal year 2000, the period ended June 30, 2000, issued on July 27, 2000, and the conference call for the investing community, including analysts, held on this same date; and (7) WorldCom's quarterly report on Form 10-Q, for the period ended June 30, 2000.

Regarding these numerous financial statements and public statements to the investing community, including analysts, the complaint maintains that Ebbers and Sullivan knew or were severely reckless in disregarding that a material amount of accounts was uncollectible when strong growth in revenue and profitability was reported by them in these statements. During the February 10, 2000 conference call, for example, Ebbers is alleged to have emphasized

WorldCom's success in 1999 by stating that "[f]or five quarters we've delivered the synergies ahead of schedule," that "EBITDA margins improved by 52% to 35.5% of revenues and added $2.6 billion of net income in 1999," and that "[c]ash earnings grew to $5.1 billion or $1.73 per share, and we accomplished that exceptional growth in profitability while adding nearly $4.7 billion of incremental revenue." During this same conference call, Sullivan is likewise alleged to have stated that:

> [W]e earned a solid 42 cents from operations in the fourth quarter . . . [W]e produced solid double-digit revenue growth in the fourth quarter . . . Based upon where we exited 1999 we feel every bit of confidence for 2000 analysts' expectations, top to bottom. This was another solid quarter for MCI WorldCom. The Company posted another quarter of increased profitability resulting from effective merger synergy execution as well as strong double-digit revenue gains . . . Fourth quarter net income nearly tripled compared to fourth quarter of 1998, while operating income more than doubled. EBITDA margins expressed as a percentage of revenues jumped over 11 percentage points during the period to over 37% . . . We significantly increased our profitability and the quality of our earnings.

The falsity of these allegedly material statements and omissions is not at issue on appeal. We nevertheless briefly set forth the complaint's allegations that these statements were false.

**D. Allegations that these Statements Were False**

Assurances accompanied WorldCom financial statements to the effect that such statements were prepared in accordance with generally accepted accounting principles ("GAAP") and that, in the opinion of management, the financial statements fairly represented

17

WorldCom's financial position and results.  GAAP (FASB Statement No. 5, par. 3) state that an estimated loss from a loss contingency "shall be accrued by a charge to income" if (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements and (ii) the amount of the loss can be reasonably estimated.[3]  The plaintiffs allege that when each of the cited statements touting the growth in revenues and income of WorldCom was made, WorldCom's revenue growth was experiencing a negative downturn and financial results were being falsely inflated by failing to establish proper and timely reserves for accounts receivable that were clearly uncollectible and "estimable."

Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), cited in the plaintiffs' complaint, states that financial statements that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  The plaintiffs point to this in support of their contention that the above listed statements were false and

---

[3]     Included in the complaint is a citation to APB Opinion No. 28, <u>Interim Financial Reporting</u>, which states that this GAAP requirement also applies to interim financial statements:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates.  To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.  Examples of such items include . . . allowance for uncollectible accounts.

misleading at the time they were made.  In further support, the complaint itemizes eleven large accounts receivable and four smaller accounts receivable that, as allegedly detailed in monthly WorldCom reports, had been uncollectible for years when the earliest of these statements were made.

As did the district court, we assume as true the complaint's allegations of false statements or omissions stemming from the failure to write off uncollectible accounts receivable.

E.   Scienter Allegations

Under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a corporate defendant. Plaintiffs must also particularize intent allegations raising a "strong inference of scienter."  The critical issue in this case is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to Ebbers and Sullivan such that this strong inference of scienter on their part is appropriate.  In the complaint, the plaintiffs state that as of February 10, 2000, Ebbers and Sullivan were aware of the existence of "no less than $685 million of grossly delinquent, disputed and uncollectible receivables" but "knowingly permitted the Company's balance sheets to reflect [these] grossly delinquent, disputed, and uncollectible receivables . . . and knowingly permitted the Company's income statements to fail to reflect a charge to earnings to reflect the write-off of these receivables."  In support of this allegation, the plaintiffs point to several pieces of

19

circumstantial evidence that they claim, together, sufficiently meet the "strong inference of scienter" requirement. However, as discussed in detail below, the plaintiffs' motive allegations, without more than is found in this complaint, are insufficient to satisfy the "strong inference of scienter" requirement.

*(1)  Motive and Opportunity*

First, the plaintiffs cite to what they characterize as "monumental" motive and opportunity evidence stemming from the Sprint merger, and, as to Ebbers individually, Ebbers' compensation package.  As alleged by the plaintiffs, the defendants initially sought to avoid taking a charge for uncollectible accounts receivable until the Sprint merger was approved by Sprint and WorldCom shareholders; then, once Sprint and WorldCom shareholders approved the merger, the defendants thereafter continued to issue artificially inflated results to ensure the deal was completed on terms most favorable to WorldCom.[4]  However, in September 2000, after the Sprint merger was rejected by federal regulators (on July 13, 2000) and after alleged substitute merger plans with Intermedia were blocked by unexpected legal hurdles,[5] the defendants allegedly

_____

[4]    As alleged in the plaintiffs' complaint, the "Sprint deal involved a stock swap based on an average closing price for WorldCom stock.  Accordingly, the higher WorldCom's stock price, the less dilution would be generated from the merger – eliminating a material, negative impact on the Company's earnings per share."

[5]    Intermedia is an Internet-services company.  On September 5, 2000, WorldCom announced its intent to merge with Intermedia.  As with the Sprint merger, WorldCom is alleged to

20

"could no longer hide" the uncollectible accounts receivable problem through a merger. Therefore, allegedly as a result of these circumstances, in September 2000, assistant controller Steven Rubio for the first time pushed WorldCom's legal group in Tulsa to write off the huge backlog of uncollectibles, stating "get [the] stuff off the books." Ten weeks after this directive, WorldCom announced the write-off of $405 million (after tax) of uncollectible receivables.

The plaintiffs cite further motive evidence related specifically to Ebbers. As alleged, Ebbers' compensation largely depended on WorldCom's reported financial results and stock price appreciation. More importantly for purposes of demonstrating a strong inference of scienter, the plaintiffs allege that if WorldCom's stock price dropped "significantly," Ebbers stood to lose millions in compensation and, if Ebbers' compensation underwent a "materially adverse" change, certain personal loans – which were secured by Ebbers' shares of WorldCom stock – would immediately become due. For example, in the complaint, the plaintiffs cite to Ebbers' personal obligations to Bank of America, including a $36 million loan and a $25 million loan, which would become due and payable upon an event of default, which included, among other things, any materially adverse change in Ebbers' compensation package from WorldCom.

---

have intended to complete the deal using its own stock as currency.

21

The defendants strive vigorously to characterize the Sprint merger as a "routine corporate event." However, like the dependence of the future prospects of the company in <u>Nathenson</u> on the success of the potential drug Vasomax, the allegations here sufficiently demonstrate the importance of the Sprint merger to WorldCom. While WorldCom characteristically engaged in numerous mergers and reverse-mergers, there was little "routine" about the Sprint merger. Ebbers himself promoted the Sprint merger as a "crucial event" for the future of WorldCom.

The motive evidence related to Ebbers individually is likewise not "without merit." Since Ebbers' loans from outside lenders, such as the Bank of America loans, were collateralized by his WorldCom stock, if the value of the stock declined such that his compensation package (including bonuses dependent on the appreciation of WorldCom stock) underwent a materially adverse change, Ebbers would have to sell his WorldCom stock immediately to repay these obligations. As alleged, this forced sale situation would have a substantial negative impact on the value of Ebbers' WorldCom stock and thus served as a strong and unique incentive for Ebbers to "inflate" WorldCom's stock price artificially.

While, at least as to Ebbers individually, we find these allegations of motive and opportunity sufficiently particularized, as we stated in <u>Abrams</u>, our court requires more than allegations of motive and opportunity to withstand dismissal. To this end, we discuss the plaintiffs' allegations of other circumstantial

22

evidence of scienter below.

*(2)  Other Circumstantial Evidence of Scienter*

In addition to allegations of motive and opportunity, the plaintiffs also point to allegations of circumstantial evidence claimed to support a "strong inference of scienter."  These allegations relate to: (1) the timing of the write-off, which indisputably occurred after the failed Sprint merger and the failed substitute Intermedia merger; (2) the magnitude of the write-off, which was, pre-tax, 62% of the total reserves balance and 28% of the net income for the third quarter of fiscal 2000; (3) Ebbers' close involvement in the day-to-day operation and management of WorldCom; and (4) Ebbers' and Sullivan's positions in WorldCom, including their alleged decision-making roles in writing off uncollectible accounts.

Upon review, we agree with the district court's assessment of the allegations of circumstantial evidence here.  The allegations fall short of meeting the "strong inference of scienter" requirement as to Ebbers and Sullivan.

As to the timing of the write-off, the plaintiffs' complaint fails to connect Ebbers or Sullivan to the statement by Rubio in September 2000 (approximately three months after the Sprint merger failed) to "get [the] stuff off the books."  Thus, the plaintiffs' argument that the timing of Rubio's instruction is circumstantial evidence that Ebbers and Sullivan were motivated by the Sprint merger to avoid making necessary write-offs is not supported by

23

their allegations.    Moreover, as to the magnitude of the write-off, the plaintiffs simply ignore evidence that WorldCom frequently took large write-offs, and that, indeed, a $768 million write-off had been taken in 1999.   Bare conclusory allegations that Ebbers and Sullivan must have known about the accounts receivable problem simply because a large write-off was made, at least in the case of a company of this magnitude, will not suffice under the PSLRA.   Similarly, the plaintiffs' general allegation that Ebbers was a "hands-on" CEO and therefore must have been aware of the accounts receivable situation simply lacks the requisite specificity.

The plaintiffs primarily focus on the last category of circumstantial evidence claimed to demonstrate scienter on the part of Ebbers and Sullivan – that Ebbers' and Sullivan's decision-making roles in the write-off process demonstrate, at the very least, that with severe recklessness they disregarded the accounts receivable problem.   However, regarding this allegation, the complaint describes a confusing procedure for writing off delinquent accounts and completely fails to connect Ebbers or Sullivan to the write-off procedure in a manner that demonstrates involvement in the initiation of write-offs.    We see these shortcomings in the complaint as critical regarding the ability of the complaint to survive dismissal.

As alleged, the legal department in Tulsa (consisting of six employees) frequently prepared a list of delinquent accounts.  A copy of this list was sent each month to certain financial

24

officers, including: Steven Rubio, the assistant controller based in Atlanta, Georgia; David Myers, the company controller based in Clinton, Mississippi; and John Krummel, president of wholesale services, based in Tulsa, Oklahoma. These lists allegedly contained the duration of an account's delinquency, the size of the account, and the circumstances surrounding the delinquency (such as whether the company was in litigation or bankruptcy or had undergone a merger). In an effort to show an awareness on the part of Ebbers and Sullivan regarding the existence of delinquent accounts, the complaint alleges that David Myers, who was on the distribution list for this monthly report, reported directly to Ebbers and Sullivan. Other than this single allegation, however, the complaint does not connect Ebbers or Sullivan to the reports. For example, the plaintiffs do not allege that Myers ever presented or discussed these reports with Ebbers or Sullivan. We agree with the district court that the PSLRA standards, as interpreted by this court, do not entitle the plaintiffs to make a conclusory assumption that simply because a monthly report was generated and distributed to an individual who reported to Ebbers and Sullivan, Ebbers or Sullivan had knowledge of certain delinquent account information which may appear in monthly reports.

The complaint's presentation of WorldCom's confusing system of writing off delinquent accounts further convinces us that the allegations here do not support a "strong inference of scienter" on the part of Ebbers or Sullivan. As set forth in the plaintiffs'

25

complaint, management approval was an express requirement for the completion of any write-off – Bob Vetera was designated to approve write-offs up to two million dollars, David Myers was designated to approve most other write-offs in excess of two million dollars, and Ebbers was designated to approve write-offs in excess of fifteen or twenty million dollars.  However, as further alleged, management could only approve a write-off <u>after</u> the legal department completed the separate process of documenting why a write-off was necessary and then requesting write-off approval from the officer specifically designated to approve the write-off.  Thus, in contrast to the plaintiffs' arguments on appeal, their complaint clearly describes a structure where write-offs are initiated by the legal department, not management, much less Ebbers and Sullivan individually.

Moreover, the complaint itself characterizes the write-off process as "cumbersome" and states that it was often ignored in the legal department, not because of some overarching directive by the defendants, but because of the unwieldy process.  For example, the complaint states that:

> In order to complete a write-off, an employee had to go into the billing platform, fill out specific forms, write a memorandum to management explaining why the write-off was necessary, and seek express management approval. Although monthly reports were prepared informing management of accounts in litigation and bankruptcy, actual write-offs were not done in a timely fashion because the process was cumbersome.  According to the Supervising Paralegal, the legal group would generally "put the accounts back on the shelf somewhere and say

26

when we have some time we'll do them."

With a complaint specifically describing a process that was difficult to follow (and admittedly much easier to ignore) and a system that allegedly called for write-offs to be initiated from the legal department rather than upper management, much less Ebbers or Sullivan, we cannot agree that this complaint specifically alleges facts demonstrating a "strong inference of scienter" as to Ebbers and Sullivan. For example, the complaint fails to allege that Ebbers ever actually received a write-off request, delayed responding to a write-off request, or rejected a request to write-off a delinquent account.

Additionally, after discussing the centralized legal group in Tulsa as controlling the information on all delinquent accounts and initiating any write-off of a delinquent account, the complaint confusingly switches gears to refer to four receivable centers (located in Dallas, San Antonio, Denver, and Atlanta) that are apparently charged with managing the collection of account receivables for key business accounts. However, the complaint does not differentiate between the accounts handled by these centers and those handled by the legal group in Tulsa, nor does it inform us whether the accounts handled by these receivable centers are included in the monthly reports generated by the legal department. In sum, the complaint's description of the process for handling delinquent accounts depicts a mismanaged accounts receivable

situation handled by many far-flung departments that frequently, without direction from upper management, simply ignored initiating the write-off of delinquent accounts receivable. These allegations are insufficient to meet the PSLRA's strict requirements for pleading scienter on the part of Ebbers and Sullivan.

The plaintiffs claim that Ebbers and Sullivan made statements to the public regarding the financial growth of WorldCom when they knew or recklessly disregarded that millions of dollars' worth of uncollectible accounts receivable were being kept on the books. In order to particularize their complaint to demonstrate a strong inference of scienter as to this kind of claim, the plaintiffs must tie Ebbers and Sullivan to the allegedly delinquent and uncollectible accounts. The complaint fails to include allegations of this nature.

Our decision in <u>Abrams</u> guides this determination. There, the plaintiff shareholders brought suit against a Houston-based oil and gas services company, the company's chief operating officer and its chief financial officer, contending that the defendants inflated the stock price of the company artificially by failing to write-off millions-of-dollars' worth of uncollectible accounts receivable, make necessary inventory write-downs, and account for certain employee compensation. <u>Abrams</u>, 292 F.3d at 427, 429. The plaintiffs' allegations were based on circumstantial evidence of scienter, including: (1) that the individual defendants (the CEO and CFO) received daily, weekly, and monthly financial reports that

28

apprised them of the company's true financial status; (2) that the defendants violated GAAP and the company's own accounting and operating procedures; (3) that the defendants were motivated by a need to raise additional capital, a desire to protect their incentive compensation, and insider stock sales; and (4) the timing of the resignation of key accounting officials. Id. at 431-32. The district court granted the defendants' motion to dismiss and we affirmed. Id. at 435. In so doing, we found the plaintiffs' pleading insufficient to demonstrate a strong inference of scienter:

> [T]he[] allegations fail to reach the required standard. Plaintiffs point to no allegations that the defendants knew about the internal control problems, only that they should have known based on their corporate positions within the company . . . The plaintiffs' allegations regarding non-specific internal reports are also inadequate. An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients. Also the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information. The plaintiffs point to no specific internal or external report available at the time of the alleged misstatements that would contradict them.

Id. at 432 (internal footnotes omitted).

As in Abrams, because the complaint here presents what could best be described as allegations of mismanagement of WorldCom's

29

accounts receivable situation, perhaps even gross mismanagement, by several individuals in charge of handling the accounts rather than severe recklessness by Ebbers and Sullivan individually, we uphold the dismissal of the complaint by the district court.

**IV.**

**ANALYSIS OF THE PLAINTIFFS' REQUEST TO AMEND**

At the end of their responsive briefing to the defendants' motion to dismiss, the plaintiffs requested leave of the district court to amend their complaint. In full, this general request states:

> Should this Court find that the Complaint is insufficient in any way, however, plaintiffs respectfully request leave to amend.
>
> The Fifth Circuit recognizes that leave to amend shall be freely given when justice so requires. Moreover, "although the decision whether to grant leave rests within the sound discretion of the district court," the federal rules strongly favor granting leave to amend. Indeed virtually all of the cases relied on by defendants allowed plaintiffs to amend following a 12(b)(6) dismissal.

(internal citations and footnote omitted). Finding that the request was "not well taken" and that the plaintiffs "have had ample opportunity to plead their case," the district court denied the plaintiffs' request. We uphold this denial.

In discussing a district court's discretion to deny a litigant leave to amend under Federal Rule of Civil Procedure 15(a), we have concluded that this "discretion is limited because Rule 15 evinces

30

a bias in favor of granting leave to amend." S. Constructors Group, Inc. v. Dynalectric Co., 2 F.3d 606, 611 (5th Cir. 1993); Little v. Liquid Air Corp., 952 F.2d 841, 846 (5th Cir. 1992). However, we have also stated that leave to amend under Rule 15 is by no means automatic. S. Constructors, 2 F.3d at 612. Indeed, we have upheld the denial of leave to amend when the moving party engaged in undue delay, Little, 952 F.2d at 846, or attempted to present theories of recovery seriatim to the district court. S. Constructors, 2 F.3d at 612. Additionally, the Supreme Court has sanctioned bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment as plausible reasons for a district court to deny a party's request for leave to amend. Foman v. Davis, 371 U.S. 178, 182 (1962); see also 6 CHARLES ALAN WRIGHT, FEDERAL PRACTICE & PROCEDURE, § 1489 (2d ed. 1990) (stating that "if a complaint as amended could not withstand a motion to dismiss, then the amendment should be denied as futile").

Here, as pointed out by the district court, in addition to being poorly drafted and repetitive, the 110-page complaint is rich in legal deficiencies. Yet, almost as an afterthought, the plaintiffs tacked on a general curative amendment request to the end of their response in opposition to the defendants' motion to dismiss. The plaintiffs were certainly aware of the defendants'

31

objections to their complaint as written (because the objections appeared in the defendants' principal motion).  Despite this awareness, the plaintiffs did not demonstrate to the court how they would replead scienter more specifically if given the opportunity, did not proffer a proposed second amended complaint to the district court, and did not suggest in their responsive pleading any additional facts not initially pled that could, if necessary, cure the pleading defects raised by the defendants.  We cannot, in these circumstances, hold that the district court abused its discretion.[6] See McKinney v. Irving Indep. Sch. Dist., 309 F.3d 308, 315 (5th Cir. 2002) (finding no abuse of discretion in the district court's denial of leave to amend where the plaintiffs failed to file an amended complaint as a matter of right or submit a proposed amended complaint in a request for leave of the court and the plaintiffs failed to alert the court as to the substance of any proposed amendment).

**V.**

**ANALYSIS OF THE PLAINTIFFS' RULE 60(b)(2) REQUEST**

---

[6]    We also note that the law firm representing the plaintiffs has apparently been previously warned by at least one circuit court against this kind of "wait and see" approach to requesting leave to amend.  See, e.g., Morse v. McWhorter, 290 F.3d 795, 800 (6th Cir. 2002) ("As to the district court's characterization of plaintiffs' maneuvering, we share the district court's frustration with the plaintiffs' apparent 'cat and mouse' class action gamesmanship.  And [] we agree that a district court's responsibilities do not include instructing ostensibly sophisticated securities class action counsel how to plead an actionable complaint . . . .").

32

After the district court's order of dismissal and while this appeal was pending, the plaintiffs filed a Federal Rule of Civil Procedure Rule 60(b)(2) motion for relief from the judgment in favor of Ebbers and Sullivan based on newly discovered evidence. Because the district court interpreted the PSLRA (and our case law analyzing this statute) to bar automatically the consideration of newly discovered evidence of securities fraud found after the filing of the plaintiffs' initial complaint, the district court denied the plaintiffs' motion without specifically considering the evidence before it in accordance with the standard applicable to a Rule 60(b)(2) motion.  As discussed below, we find no support in our case law for such a blanket rule; however, because the plaintiffs have not met their burden under Rule 60(b)(2), we ultimately agree with the district court that denial of the plaintiffs' motion is proper.

**A.   Substance of the Plaintiffs' Motion**

In their motion, the plaintiffs asked the district court "to reopen this matter and allow Plaintiffs to file a Second Amended Complaint" due to "crucial, newly discovered evidence that, if presented in this matter, would likely change the result of dismissing this case with prejudice."  Although the complaint contained allegations of misstatements and omissions resulting from a wide variety of financial irregularities, the Rule 60(b)(2) motion focuses, as does this appeal, on the claim of fraud related to the uncollectible accounts. Regarding the specific "newly

33

discovered" evidence, the plaintiffs cited to and attached as exhibits hundreds of pages of evidence, including: (1) WorldCom's report on Form 8-K, filed with the SEC on June 25, 2002, in which WorldCom states that it plans to restate its financial statements for 2001 and the first quarter of 2002, and WorldCom's report on Form 8-K, filed with the SEC on August 8, 2002, in which WorldCom reveals that its financial statements for fiscal year 2000 and, possibly, 1999 would require restatement and included over $3 billion in additional accounting errors; (2) the transcript from the September 26, 2002, guilty plea of David Myers, WorldCom's former Controller, in the Southern District of New York; (3) numerous internal memoranda and e-mails from WorldCom, in which certain employees identify Sullivan as the decision-maker regarding certain improper line cost accruals and prepaid capacity entries and in which (in the copy of the minutes from WorldCom's audit committee meeting on March 6, 2002) Sullivan is cited as indicating that Ebbers sought to cut WorldCom's internal audit budget by 50% during the period when an internal audit investigating WorldCom's accounting fraud was underway; (4) various court pleadings, including the government's indictment of Sullivan and the SEC's complaint against WorldCom, both filed in the Southern District of New York; (5) various congressional documents, including the complete transcript from a hearing of the House of Representatives' Financial Services Committee in which both Sullivan and Ebbers invoke their Fifth Amendment right against self-incrimination; and

34

(6) three news releases discussing accounting irregularities and internal fraud plaguing WorldCom.

In their post-judgment briefing, the plaintiffs maintained that this material supports their contentions that the defendants intentionally made false statements during the class period. The plaintiffs generally stated that WorldCom's report on Form 8-K, filed with the SEC on August 8, 2002, is "crucial" in that it reveals that WorldCom's 1999 and 2000 financial statements would require restatement and included over $3 billion in additional accounting errors. However, other than this general statement, the only portion of the attached evidence specifically referenced by the plaintiffs in their post-judgment briefing is a portion of the transcript from the guilty plea of David Myers who, as alleged, reported directly to Ebbers and Sullivan as upper management. The cited portion of the transcript provides:

> From at least October 2000 through June 2002, internal financial reports at WorldCom consistently reflected that WorldCom's expenses as a percentage of revenue were too high to meet analysts' expectations and management's guidance to professional securities analysts and the investing public. As a result, I was instructed on a quarterly basis by senior management to ensure that entries were made to falsify WorldCom's books to reduce WorldCom's reported actual costs and therefore to increase WorldCom's reported earnings. Along with others, who worked under my supervision and at the direction of WorldCom senior management, such accounting adjustments were made for which I knew that there was no justification or documentation and which I knew were not in accordance with Generally Accepted Accounting Principles.

35

## B.    The District Court's Ruling

The district court denied the plaintiffs' motion.  The court recognized that "[s]ince the Opinion and Order of this Court of March 29, 2002, the near collapse and bankruptcy of WorldCom and its firing of Ebbers and Sullivan have been national news and WorldCom has made public admissions of financial irregularities . . . [and] [t]hus it would appear that as of the time of filing their Amended Class Action Complaint . . . serious financial misstatement and perhaps securities fraud had occurred."  However, without addressing the Rule 60(b) standard, the district court concluded that, as a matter of law, the new evidence could not form a basis for the relief sought by the plaintiffs.  In so finding, it explicitly relied on our Nathenson opinion to state, as the district court described it, that "[t]he strong inference of scienter must arise from facts stated with particularity in the complaint and those facts must **now** present a strong inference of scienter." (emphasis in district court's opinion).  The district court went on to further explicate its ruling:

> The Complaint was dismissed partly because of a failure to plead scienter.  The discovery of this new evidence does not change the fact that scienter was not pled with particularity in the Complaint.  <u>The Plaintiffs are not entitled to amend their complaint in order to replead with particularity an element such as scienter that should have been properly pled in the beginning.</u> Plaintiffs complain that they were unable to discover this information because they were prohibited from taking formal discovery by the PSLRA.  This is precisely the purpose of the pleading requirement of the PSLRA, for the

36

> plaintiff to lay out the who, what, when, and where in the pleadings <u>before</u> access to the discovery process is granted, to prevent abusive, frivolous strike suits.

(emphasis added).  Below, we discuss tension we perceive between language in this order and our case law.

### C.    Rule 60(b) Standards and the PSLRA

The only issues on appeal of a Rule 60(b) motion are "the propriety of the denial of relief . . . and whether the court abused its discretion in denying relief."  <u>Provident Life & Accidental Ins. Co. v. Goel</u>, 274 F.3d 984, 999 (5th Cir. 2001); <u>Halicki v. La. Casino Cruises, Inc.</u>, 151 F.3d 465, 471 (5th Cir. 1998) (stating that abuse of discretion standard applies to our review of the denial of a Rule 60(b) motion).

The basis of the district court's order is that, Rule 60(b) standards aside, our prior case law reads into the PSLRA a requirement that plaintiffs pursuing a securities action must always plead facts with the requisite particularity and specificity in the "beginning."  We have never endorsed this proposition so broadly cast.

Rule 60(b) provides, in relevant part, that: "On motion and upon such terms as are just, the court may relieve a party . . . for the following reasons . . . (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)."  FED. R. CIV. P. 60(b)(2).  To succeed on a motion for relief from judgment based on newly

37

discovered evidence, our law provides that a movant must demonstrate: (1) that it exercised due diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment. See Provident Life & Accidental Ins. Co., 274 F.3d at 999. As the defendants note, we have also "described as self evident the requirements that newly discovered evidence be both admissible and credible." Id. at 984 (internal quotation omitted).

Here, the district court interpreted our PSLRA case law to bar a plaintiff from utilizing evidence discovered after his or her initial complaint was filed. It thus did not cite to, discuss or analyze the plaintiffs' new evidence under the applicable Rule 60(b) standard. However, our Nathenson opinion did not address a Rule 60(b)(2) motion and therefore was not intended to augment the PSLRA with the limitation that a plaintiff be precluded from ever utilizing new evidence discovered after the filing of his or her initial complaint.

The "now" in the portion of the Nathenson opinion cited by the district court in support of its conclusion that new evidence cannot, as a matter of law, ever be the basis of a Rule 60 motion in the context of a PSLRA case was not intended to be interpreted in this manner. Rather, in discussing the impact of the PSLRA on pre-PSLRA case law analyzing motive and opportunity in the context of scienter, we quoted the First Circuit's Greebel v. FTP Software,

38

<u>Inc.</u>, 194 F.3d 185 (1st Cir. 1999), opinion in stating that "whatever characteristic pattern of facts alleged, those facts must now present a <u>strong</u> inference of scienter." <u>Id.</u> at 196 (emphasis in original). The "now" (which, in contrast to the district court's order, was not emphasized in the original opinion) was simply meant to contrast the intent requirement pre-PSLRA with the "strong inference of scienter" requirement post-PSLRA. Our reference to the word "now" as quoted in <u>Greebel</u> should not be taken out of context to preclude, in every instance, a plaintiff from utilizing new evidence discovered after the filing of his or her initial securities fraud complaint.

Ultimately, we need not decide whether or to what extent new evidence, discovered after the dismissal of a complaint based on the plaintiff's failure to satisfy the requirements of the PSLRA, can form a basis for the granting of a Rule 60(b)(2) motion.[7] We need only decide that in such a situation, at a minimum, the

---

[7] We are unaware of any circuit endorsing a blanket rule disallowing the consideration of newly discovered evidence in the context of a PSLRA case. To the contrary, two circuits have authorized the granting of a Rule 60(b)(2) motion based on newly discovered evidence in these circumstances. <u>See</u> <u>Werner v. Werner</u>, 267 F.3d 288, 296-97 (3d Cir. 2001) (remanding a case governed by the PSLRA with instructions to allow the plaintiffs to amend their complaint based on newly discovered corporate board minutes because the court "will not add to the strict discovery restrictions in the [PSLRA]" by augmenting the "high burdens the PSLRA placed on plaintiffs [already]"); <u>Alpern v. UtiliCorp United, Inc.</u>, 84 F.3d 1525, 1533-34 (8th Cir. 1996) (reversing the district court's denial of a Rule 60(b)(2) motion based on a newly discovered internal corporate memorandum detailing illegal conduct).

primary Rule 60(b) inquiry – whether the evidence clearly would have produced a different result if present before the original judgment – would have to be analyzed through the prism of PSLRA particularity standards (which are, of course, more stringent than general notice pleading standards). Abrams, 292 F.3d at 432.

Here, the lack of evidence of particularized pleading in this case persuades us to uphold the district court's denial of the plaintiffs' Rule 60(b) motion.

Even if we assume for the sake of this appeal that the newly discovered evidence submitted by the plaintiffs is admissible and credible, two issues the defendants vehemently dispute, the plaintiffs' Rule 60(b) motion is insufficient as a matter of law to merit the "extraordinary" remedy they seek. Pease v. Pakhoed, 980 F.2d 995, 998 (5th Cir. 1993) ("Courts are disinclined to disturb judgments under the aegis of Rule 60(b)."); Longden v. Sunderman, 979 F.2d 1095, 1102 (5th Cir. 1992) (stating that relief under 60(b) is "extraordinary . . . and the requirements of the rule must be strictly met"). As they did in crafting their complaint, the plaintiffs here simply inundated the district court with an avalanche of material in the hopes that the court would, on its own, connect the dots between any bad act found in the material and allegations related to the single claim against Ebbers and Sullivan in this case. This is not the court's burden. Rather, if a Rule 60(b)(2) motion were to succeed, it would be the plaintiffs' heavy burden to demonstrate to the district court how this newly

40

discovered evidence is "material and controlling and <u>clearly</u> would have produced a different result if presented before the original judgment." <u>N. H. Ins. Co. v. Martech USA, Inc.</u>, 993 F.2d 1195, 1201 (5th Cir. 1993) (quotation omitted and emphasis added). Here, the plaintiffs' four-page motion for relief from judgment (appended to hundreds of pages of evidence) simply does not cut it. It is not enough to state, in a conclusory fashion, that "[t]his newly discovered evidence is highly probative of defendants' fraudulent intent during the Class Period and should change the outcome of this case." <u>Provident Life & Accidental Ins. Co.</u>, 274 F.3d at 999. This tells the district court nothing regarding whether the evidence submitted is relevant, material and controlling regarding the narrow sliver of fraudulent conduct alleged in the plaintiffs' complaint to have occurred and does not demonstrate how the plaintiffs would have <u>pleaded</u> their complaint differently had this evidence been available to them prior to the judgment being entered against them.

The PSLRA sets forth a pleading standard, not an evidentiary standard, and charges the plaintiffs with the duty of connecting their proffered evidence to particularized allegations of scienter in their pleading. Here, the lion's share of the evidence appended to the plaintiffs' Rule 60(b) motion relates to the improper capitalization of certain line item costs (that, as operating expenses, should have been deducted from WorldCom's revenues and should not have been subject to depreciation) and improper

accounting treatment of certain reserve accounts.  Neither the reserve for uncollectible accounts nor uncollectible accounts generally are mentioned, a fatal problem when the only remaining claim in this case focuses on both.

As with the plaintiffs' request for leave to amend, the plaintiffs did not submit a proposed second amended complaint with their Rule 60(b) motion, nor have they demonstrated in their original motion or their reply memorandum how they would have pleaded this case differently had this evidence been available to them.  This complete lack of effort regarding the Rule 60(b) standard compels us to uphold the denial of the plaintiffs' Rule 60(b) motion.

## VI.

### CONCLUSION

In No. 02-60322, we AFFIRM the judgment of the district court only insofar as it dismissed with prejudice the plaintiffs' complaint against Ebbers and Sullivan; we retain jurisdiction of the pending appeal as to WorldCom.  In No. 03-60248, we AFFIRM the district court's post-judgment order denying the plaintiffs' Rule 60(b) motion for relief from judgment in favor of Ebbers and Sullivan.  All pending motions are DENIED as moot.

42